# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CONTRELL PLUMMER,**<br><br>   Plaintiff,<br><br>v.<br><br>**JAMES BELFORD, et al.,**<br><br>   Defendants. | Case No. 20-CV-01247-SPM |

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Pending before the Court is a Motion for Summary Judgment filed by Defendants James Belford, Keith Staszak, and Robert Tomshack, Jr. (Doc. 33). *Pro se* Plaintiff Contrell Plummer filed a Response. (Doc. 36). Having been fully informed of the issues presented, this Court **GRANTS** the Defendants' Motion for Summary Judgment.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

*Pro se* Plaintiff Contrell Plummer is an inmate presently incarcerated at Pinckneyville Correctional Center in Pinckneyville, Illinois. (*See* Doc. 1). The instant suit arises from six strip searches in 2018 that Plummer alleges were unconstitutional under the Fourth and Eighth Amendments. (*See id.*). Plummer allege that these searches were conducted by Sergeant James Belford, Correctional Officers Staszak and Helsey, and other Jane/Johns Does on February 6, May 4, June 13, September 18, September 25, and October 30, 2018. (*See id.*, pp. 6–7, 11). These

searches were performed on inmates prior to receiving at the Healthcare Unit ("HCU"). (*See* Doc. 34, ¶ 5 (citing *id.*, Ex. A 12:6–11, 20:24–21:10, 26:4–6, 27:21–23, 29:11–13, 30:24–31:1)). The searches were conducted in a laundry room adjacent to the HCU. (*See id.*, ¶ 15 (citing *id.*, Ex. A 16:1–12, 22:2–16, 26:20–23, 29:14–17, 30:24–31:1, 31:11–14)). Plummer alleges that prisoners were searched by male Corrections Officers only (*see id.*, ¶ 31 (citing *id.*, Ex. A 41:4–17, 41:20–23, 48:6–23)); that as many as six inmates were searched at a time ((*see id.*, ¶ 25 (citing *id.*, Ex. A 25:5–17, 26:24–27:2, 28:6–17, 29:3–30:6, 31:21–25, 52:12–19, 53:17–21)); that they were generally required to remove all of their clothes (*see id.*, ¶ 28 (citing *id.*, Ex. A 34:20–35:3, 35:15–20, 43:19–24, 49:6–22, 50:24–51:4, 51:20–52:8)); that the searches were visual inspections only (*see id.*, ¶ 30 (citing *id.*, Ex. A 35:23–36:4, 36:16–18, 43:25–44:2, 49:23–25, 51:5–7, 52:9–11, 53:14–16); and that Defendant Belford sometimes made lewd comments about the inmates' bodies (*see id.*, ¶¶ 18–20 (citing *id.*, Ex. A 39:4–25, 57:2–58:1, 58:4, 54:1–12, 56:22–57:4, 59:6–10)).

Plummer originally brought suit on November 16, 2020 against Sergeant James Belford; Acting Illinois Department of Corrections ("IDOC") Director John R. Baldwin; Officer Keith Staszak; Officer Hesley; Warden Scott Thompson; Lieutenant Mac-Shane Frank; various John/Jane Does; and Officer Robert Tomshack, Jr. (*See* Doc. 1). The Court conducted preliminary review of Plummer's Complaint on December 16, 2021 and dismissed Plummer's claims against the John/Jane Does, IDOC Director Baldwin, Warden Thompson, and Officer Helsey for failure to adequately describe their unconstitutional conduct to the extent required by Federal

Rule of Civil Procedure 8. (*See* Doc. 11, pp. 2–4). The Court also consolidated Plummer's claims into three counts: (1) a Fourth Amendment claim against Belford, Staszak, Frank, and Tomshack for conducting unreasonable searches in the healthcare unit; (2) an Eighth Amendment cruel and unusual punishment claim against Belford, Staszak, Frank, and Tomshack for subjecting Plummer to strip searches in the healthcare unit in 2018; and (3) a Prison Rape Elimination Act claim against Belford, Staszak, Frank, and Tomshack for subjecting Plummer to strip searches in the healthcare unit. (*See id.*, p. 4). The Court dismissed Plummer's third count as the Prison Rape Elimination Act does not provide a private right of action. (*See id.*, p. 5). The Court also dismissed all of the official capacity claims against Belford, Staszak, Frank, and Tomshack because the Eleventh Amendment bars official capacity claims for money damages. (*See id.*, p. 5). Warden David Mitchell of Pinnkneyville was also added to the docket to implement any injunctive relief that could be ordered. (*See id.*, pp. 5–6).

Defendant Frank later filed a Motion for Summary Judgment for failure to exhaust administrative remedies on November 22, 2022 (Doc. 27), which the Court granted on August 23, 2023 (*see* Doc. 31). The instant Motion was filed on July 22, 2024 (*see* Doc. 33). Plummer responded on October 21, 2024. (*See* Doc. 42).

## APPLICABLE LAW AND LEGAL STANDARDS

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014)

(quoting FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Stated another way, the nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) *(*citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008) (quoting *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008)). The non-movant cannot simply rely on its pleadings; the non-movant must present admissible evidence that sufficiently shows the existence of each element of its case on which it will bear the burden of proof at trial. *Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (citing *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 394 (7th Cir. 1993), *cert. denied*, 510 U.S. 1111 (1994); *Celotex*, 477 U.S. at 323–24).

ANALYSIS

**I. Fourth Amendment**

"Fourth Amendment searches of prisoners, like all Fourth Amendment searches, are evaluated for reasonableness." *West v. Radtke*, 48 F.4th 836, 852 (7th Cir. 2022) (citing *Kentucky v. King*, 563 U.S. 452, 459 (2011)). "To assess the reasonableness of a search of a prisoner, '[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). "The inquiry, however, accounts for the 'wide-ranging deference' owed to prison administrators in their adoption of practices to maintain order and security." *Id.* at 852–53 (quoting *Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020) (en banc)). "It is well established that strip searches of inmates performed for security purposes are reasonable as a general matter." *Id.* at 853 (citing *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 328–29 (2012); *Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 696–97 (7th Cir. 1998)).

The Defendants argue that "[t]he strip searches of which Plaintiff complains do not rise to the level of violation of the Plaintiff's Fourth Amendment privacy rights" because "[t]aken as a whole, these searches maximized the privacy concerns of the prisoners under the circumstances while achieving the legitimate institutional objective of detecting and deterring possession of contraband." (Doc. 34, p. 9). They argue that the searches of male inmates were conducted by male officers only, that no female personnel were present, that the searches were only visual inspections, and

that up to six inmates were searched at a time in searches lasting as long as five to ten minutes. (*Id.*). They note that Plaintiff Plummer admits that "that the searches took place because Defendant Belford believed some prisoners were moving contraband around the facility." (*Id.* (citing *id.* ¶ 9)). They argue that Seventh Circuit precedent indicates that strip searches are presumptively reasonable and that the Fourth Amendment is not implicated when there is no intrusion into the prisoner's body. (*Id.*, p. 10 (citing *Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 697 (7th Cir. 1994); *King v. McCarty*, 781 F.3d 889, 900 (7th Cir. 2015); *Sparks v. Stutler*, 71 F.3d 259 (7th Cir. 1995); *Sanchez v. Pereira-Castillo*, 590 F.3d 31 (1st Cir. 2009); *Lisle v. Prentice*, 2018 U.S. Dist. LEXIS 207650 (Ill. Cent. Dist. 2018))).

Plummer cites *Young v. County of Cook*, 616 F. Supp. 2d 834 (N.D. Ill. 2009) for the proposition that group strip searches conducted without privacy violate the Fourth Amendment. (*See* Doc. 42, p. 5 (citing *Young* at 854–55)). He also argues that "Defendant Belford openly admitted that there was absolutely no reasonable suspicion that Plaintiff or any other of the individuals who were subjected to the October 23, 2018, group strip search were in possession of any contraband." (*Id.*).

First, the Defendants are wholly incorrect in their assertion that the Fourth Amendment does not cover visual-inspection-only strip searches. (*See* Doc. 34, p. 10 (citations omitted)). The Seventh Circuit held in *Henry v. Hulett*, 969 F.3d 769, 783 (7th Cir. 2020) that "we overrule our decision in *Johnson* to the extent it deems the Fourth Amendment inapplicable to visual inspections during bodily searches." *Id.* (citing *Johnson v. Phelan*, 69 F.3d 144 (7th Cir. 1995)). The Seventh Circuit was

explicit that "[n]o other circuit has announced (nor ever entertained the notion) that the Fourth Amendment reaches only searches that involve a physical intrusion by a searching official." *Id.* at 782. Thus, the strip searches at issue in this case must be analyzed for reasonableness, which is "an objective test," meaning that "a defendant's subjective state of mind is irrelevant to a court's Fourth Amendment analysis." *Id.* at 781 (citing *Graham v. Connor*, 490 U.S. 386, 398 (1989)).

In *Henry*, the administrators at Lincoln Correctional Center in Illinois subjected some 200 inmates at a time to strip searches solely for the purpose of training Illinois Department of Corrections cadets. 969 F.3d at 774. The Seventh Circuit remanded the Fourth Amendment claim to the district court because the lower court had concluded that the Fourth Amendment did not cover the searches in question and, thus, had not conducted a reasonableness analysis. *See id.* at 784. *Johnson* involved more pervasive visual searches—the plaintiff in that case objected to female guards being assigned to monitor his movements, including when he was naked. *See* 69 F.3d at 145. Even though the *Henry* court overruled the *Johnson* court's ruling that the Fourth Amendment did not apply to visual searches, it held that "the result in *Johnson* would have been no different under a reasonableness analysis, given the limited nature of the intrusions at issue and the ever-present institutional concerns over safety and security." *Henry* at 783.

Plummer's reliance on *Young* is misplaced. In *Young*, misdemeanor detainees in a jail were searched en masse, with dozens of inmates searched at the same time with zero privacy and in a location where bodily fluids were present on the floor and

dogs were used for harassment and intimidation. *Id.* at 850–52. The district court in *Young* found that no reasonable jury could determine that these searches were reasonable under the Fourth Amendment. *See id.* at 852. While Plummer is correct that privacy screens were not used in the searches in question, it is undisputed that groups of no more than six inmates (with groups of three being most common) were searched in the laundry room. (*See* Doc. 34, ¶ 16 (citing *id.*, Ex. A 14:16–15:12, 16:15–17:5, 25:5–17); *id.*, ¶ 25 (citing *id.*, Ex. A 25:5–17, 26:24–27:2, 28:6–17, 29:3–30:6, 31:21–25, 52:12–19, 53:17–21)). They were not subjected to bodily cavity searches and were only inspected by male officers. (*See id.*, ¶ 30 (citing *id.*, Ex. A p. 35:23–36:4, 36:16–18, 43:25–44:2, 49:23–25, 51:5–7, 52:9–11, 53:14–16)).

The question, then, is whether the instant facts are distinguishable from those in *Henry*. This Court holds that they are, indeed, distinguishable from *Henry*. Regardless of Plummer's arguments that Defendant Belford had no reasonable objective for the visual searches of the inmates and "called the searches 'purely because he wanted to,'" it is undisputed that the search for contraband is a legitimate and reasonable penological interest. (Doc. 34, ¶ 10 (citing *id.*, Ex. A, p. 19:10–20:9, 25:18–21, 27:3–10, 28:18–21, 29:4–7, 30:10–17, 32:1–4)). Defendant Belford has stated (and Plummer does not dispute) that Belford believed that prisoners were moving contraband throughout the facility. (*See id.*, ¶ 9 (citing *id.*, Ex. A 18:17–19:9); Doc. 1, ¶ 33). Moreover, established caselaw is clear that Belford's state of mind is not applicable to this Court's reasonableness analysis. *Henry* at 781 (citing *Graham* at 398). Unlike in *Young* or *Henry*, Plummer and his fellow inmates were not searched

en masse. They were searched in small groups by same-sex guards. Thus, even though the Defendants misstate the applicability of the Fourth Amendment to the instant facts, the Court holds that the visual strip searches at issue were objectively reasonable and supported the legitimate penological interest of finding and disincentivizing inmates' possession of contraband. No reasonable jury could conclude that the strip searches at issue violated the Fourth Amendment. Therefore, summary judgment must be granted on Plummer's Fourth Amendment claim.

**II. Eighth Amendment**

"Strip searches of prisoners violate the Eighth Amendment if their purpose is 'maliciously motivated, unrelated to institutional security, and hence totally without penological justification.'" *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004) (internal quotation marks and citations omitted). Searches are penologically justified when reasonably related to finding contraband that threatens the safety and security of the prison. *See Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 695, 697 (7th Cir. 1998); *Del Raine v. Williford*, 32 F.3d 1024, 1029, 1041 (7th Cir. 1994) (citing *Bell v. Wolfish*, 441 U.S. 520, 550–51 (1979)). "To overcome summary judgment, [the Plaintiff] ha[s] to produce evidence showing that the officers conducted the search in a harassing manner intended to 'humiliate and inflict psychological pain.'" *Jones v. Anderson*, 116 F.4th 669, 678 (7th Cir. 2024) (quoting *Whitman*, 368 F.3d at 934).

The Defendants argue that Belford "was concerned about smuggling contraband at PCC, a legitimate state interest" and that "[i]n fact, contraband was discovered during one of the searches." (Doc. 34, p. 12 (citing *id.*, ¶ 9)). They also argue

that the searches were constitutionally permissible and were not "conducted in a harassing manner intended to humiliate and inflict psychological pain on the Plaintiff." (*Id.* (citing *Peckham* at 697; *Johnson* at 150–51)). They argue that "although the Defendants lack knowledge or information to form a belief about the Plaintiff's allegation of degrading and humiliating remarks made during the strip searches, even if the remarks are taken as true, they do not constitute cruel and unusual punishment under the Eighth Amendment." (*Id.*, p. 13). Regarding these comments, the Defendants argue that "Plaintiff's allegations presumably pertain to Belford only, as he does not recall Staszak making any lewd comments and stated that Tomshack did not make any lewd comments." (*Id.*, p. 14 (citing *id.*, ¶¶ 23, 24)).

Plummer argues that the searches were not reasonable because he was never found to *personally* have contraband during the searches. (*See* Doc. 42, p. 5). He argues that Belford's aim to deter possession of contraband is not an adequate reasonable suspicion. (*See id.*, pp. 5–6). He also argues that Belford made "offensive" and "lewd" comments to prisoners, including disparaging comments about a boil on his chest. (Doc. 34, ¶¶ 18, 20 (citing *id.*, Ex. A 39:4–25, 54:1–12, 56:22–57:4)). He also claims that the only contraband found was "a pornographic magazine and some commissary items." (*Id.*, Ex. A 18:24–25).

The Seventh Circuit has stated that "[s]earches are penologically justified when reasonably related to finding contraband that threatens the safety and security of the prison." *Chatman v. Gossett*, 766 F. App'x 362, 364 (7th Cir. 2019) (citing *Peckham*, 141 F.3d at, 695, 697; *Del Raine v. Williford*, 32 F.3d 1024, 1029, 1041 (7th

Cir. 1994)). In *Chatman*, "[t]he prison presented uncontradicted evidence that the searches were intended to prevent ingredients for alcohol production and consumption from leaving the bakery." *Id.* "Preventing the distribution of intoxicating substances is a valid penological justification." *Id.* As contraband can include such unassuming items as "ingredients for alcohol production," *id.*, it is reasonable that even the "commissary items" that Plummer mentioned were confiscated (Doc. 34, Ex. A 18:25) could be disruptive in the prison setting.

Plummer has also failed to provide evidence that the Defendants "conducted the searches 'in a harassing manner intended to humiliate and inflict psychological pain.'" *Chatman* at 364 (quoting *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003)). In *Chatman*, the Seventh Circuit upheld strip searches in which the inmates were not touched, where there were no "gratuitous or insulting comments," and where the searches were conducted in "semi-private rooms" in groups of two inmates. *Id.* Even though there were windows in the room in question, "the searches were not 'in public,' and the defendants sought to limit exposure." *Id.*

Comparing the searches in *Chatman* with those at issue here, the only differences are the larger number of inmates searched at a time (six versus two) and the alleged comments about the inmates' bodies and about Plummer's boil. (Doc. 34, ¶¶ 18, 20 (citing *id.*, Ex. A 39:4–25, 54:1–12, 56:22–57:4)). Even though Plummer claims that the door to the laundry room was open (*id.*, Ex. A 42:8–17) during the searches, the searches in question align with the "semi-private room" used in *Chatman*. *Id.* at 364. Regarding the lewd comments, Plummer mentions comments

made by Belford about the boil on his chest, but does not remember the specific incident, comments, or timeframe (*id.*, Ex. A 54:7–12). He also mentions comments made by Belford that another inmate was losing weight (*id.*, Ex. A 59:12–14; *see* Doc. 42, p. 21) and mentions that two other inmates filed Prison Rape Elimination Act claims (Doc. 34, Ex. A 59:15–18). While Plummer includes the grievances filed by one of these inmates (Abdul Love) with his Response (*see* Doc. 42, pp. 17–24, 44–50), Love is not a plaintiff in this action. Love mentions that Defendant Belford commented on the size of inmate Thigpen's genitals (*see* Doc. 42, p. 11 ("Upon exiting the laundry room, I heard Defendant James Belford complimented Mr. Thigpen on having a large penis.")) but does not mention any remarks made toward Plummer.

Looking at the grievances in question (*see* Doc. 1, pp. 29–34), while Plummer states that he had "on open wound of a boil on his chest" (*id.*, p. 30), he does not mention any specific comments that Defendant Belford made about it. His grievance mentions that he had to dress his wound with toilet paper and that another inmate received better care for a boil than did Plummer (*see id.*); this has no bearing on whether Defendant Belford made lewd comments to Plummer or not. Additionally, while Plummer's Complaint alleges that "Plaintiff and the other naked individuals had to endure humiliating and degrading remarks about their genitals and the treatment Plaintiff and others received," (Doc. 1, p. 7), Plummer did not provide any details of these remarks in his Deposition. Thus, Plummer has not provided any details of any of the alleged comments made by Defendant Belford, either in his

grievances, his Complaint, his deposition, or in his Response to the Defendants' Motion for Summary Judgment.

Turning to analysis of other analogous cases, the description of the searches that Plummer provides in his deposition (*see* Doc. 34, Ex. A 54:20–56:15) does not approach the facts described in *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) where the plaintiff was subjected to " daily strip searches in view of other inmates, . . . sometimes done in a cold room, [where] . . . guards did not regularly change their latex gloves, . . . sometimes made demeaning comments as they searched the naked prisoners, and that the searches were done in knowing violation of the prison's regulations."

Plummer also cites to *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983), which is clearly distinguishable because the strip searches in that case involved jailhouse searches of female misdemeanor offenders. (*See* Doc. 42, p. 4 (citing the same)). Moreover, the Supreme Court upheld the strip searches (but not the body cavity searches) at issue in *Bell v. Wolfish*, 441 U.S. 520, 558 (1979). (*See* Doc. 42, pp. 4, 7 (citing *Bell*)). Thus, while the lewd comments allegedly made by Defendant Belford give this Court pause, the complete lack of admissible evidence that Plummer has presented regarding the lewd comments made to him *personally* is distinguishable from the conduct at issue in *Mays*, where other factors besides lewd comments alone rendered the strip searches in question unconstitutional. *See Mays*, 575 F.3d at 649; (Doc. 34, Ex. A 21:11–13 ("But one particular time when he shook us down -- he strip-searched us, I had the boil on my chest. So, you know."), 54:7–12

("Because I know one particular grievance, I wrote that I had a boil on my chest and that he made lewd comments. And I would have to look at my grievance. I can't recall right offhand a specific incident happened on those particular days.")).

The Court is concerned about the lack of specificity regarding the nature of Plummer's discussion of alleged "lewd comments," especially since these comments were not mentioned in Plummer's grievances. (*see* Doc. 1, pp. 7, 29–34; Doc. 34, Ex. A 21:11–13, 54:7–12); *see also Charles v. Neal*, No. 3:18-CV-592-RLM-MGG, 2019 WL 1275089, at *3 (N.D. Ind. Mar. 20, 2019) ("Further, the evolving nature of Ms. Renee's description of the January 17 strip search raises significant concerns with her credibility."). Additionally, even if Belford did make lewd comments, like in *Peckham*:

> There is nothing alleged here which could lead a fact finder to conclude that any of the searches were for harassment purposes or any purposes that could reasonably be said to be punishment. The searches were for legitimate, identifiable purposes, and given the deference we accord to prison authorities to run their institutions, there is no way the Eighth Amendment, on these facts, could come to Peckham's defense.

141 F.3d at 697. Therefore, regardless of what exactly Belford said to Plummer (and when), the Court holds that whether or not Plummer made comments about Plummer's boil or his body is not sufficient to establish a genuine issue of material fact sufficient to defeat the Defendants' Motion for Summary Judgment.[1] Therefore, Plummer's Eighth Amendment claim does not survive.

---

[1] While Plummer's Eighth Amendment claim does not survive, even if it did, the Court also notes that Plummer indicates that Defendants Staszak and Tomshack did not make any lewd comments. (*See* Doc. 34, ¶¶ 23, 24 (citing *id.*, Ex. A 60:3–6, 9–11)). Thus, even if the claim against Belford held water, those related to Staszak and Tomshack would have to be dismissed.

The Court also notes that Plummer states that he "renews his motion that this action be certified as a class action." (Doc. 42, p. 6). This Court already addressed this request in its preliminary review of his Complaint. (*See* Doc. 11, p. 6). Plummer cannot represent a class of plaintiffs as a *pro se* litigant. (*See id.* (citing *Lewis v. Lenc-Smith Mgf. Co.*, 784 F.2d 829, 831 (7th Cir. 1986); 28 U.S.C. § 1654; FED. R. CIV. P. 11)).

### III. Qualified Immunity

The Defendants also argue that they are entitled to qualified immunity shielding "government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. (Doc. 34, p. 14 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011))). "Qualified immunity is an affirmative defense, but once it is raised the burden shifts to the plaintiff to defeat it." *Holleman v. Zatecky*, 951 F.3d 873, 877 (7th Cir. 2020) (citing *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001)). "To overcome qualified immunity, the facts viewed in the light most favorable to [the plaintiff] must 'show that the defendant[s] violated a constitutional right' and that 'the right was clearly established at [that] time.'" *Id.* (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 550 (7th Cir. 2017)). Notably, "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Henry*, 969 F.3d at 785 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "The right must be established not as a general proposition but

in a particularized manner so its contours are clear to a reasonable official." *Id.* (citing *Reichle v. Howards*, 566 U.S. 658, 665 (2012)).

The Defendants argue that "[u]nder the first prong of the analysis, the facts alleged here do not give rise to a constitutional violation" because "Defendants conducting the strip searches did not violate the Plaintiff's Fourth or Eighth Amendment privacy rights." (Doc. 34, p. 15). "Under the second prong of the analysis, Defendants are also entitled to qualified immunity because if they were to be held liable on the facts alleged it would constitute a heightened standard for what constitutes an Eighth Amendment cruel and unusual punishment claim." (*Id.*). They argue that "finding against Defendants would necessarily mean the task of determining whether a policy is reasonably related to legitimate security interests is no longer peculiarly within the province and professional expertise of corrections officials" and that "[s]uch a finding would be contrary to the established precedent of this Circuit as discussed." (*Id.*, pp. 15–16).

In response, Plummer argues that "[i]gnorance of the law is not an excuse" and that the group strip searches in question were conducted "without privacy or reasonable suspicion." (Doc. 42, p. 7). He points to *Bell*, *Mary Beth G*, and *Young* as establishing that strip searches like those in question were clearly unconstitutional. (*See id.*).

As assessed *supra*, even viewed in the light most favorable to him, Plummer's Fourth and Eighth Amendment claims do not survive scrutiny and, thus, fail the first prong in the qualified immunity analysis. Regarding the second prong, whether or

not the constitutional rights in question were clearly established at the time, existing caselaw does not precisely illuminate the outer limits of constitutionally permissible group strip searches in relation to the Fourth and Eighth Amendments. Put another way, there is no algorithm to determine which set of conditions is required to render searches wholly constitutional or unconstitutional, thus putting prison officials on notice. *Henry*, 969 F.3d at 785 (citing *Reichle v. Howards*, 566 U.S. 658, 665 (2012)). Regardless of the Defendants' arguments that assessing this second prong in Plummer's favor would constitute issuance of a heightened pleading standard, the Court holds that the Defendants would have been entitled to qualified immunity had either of Plummer's claims survived.

## Conclusion

For the reasons set forth above, Defendants James Belford, Keith Staszak, and Robert Tomshack, Jr.'s Motion for Summary Judgment (Doc. 33) is **GRANTED**. This case is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: December 19, 2024**

> **/s/ Stephen P. McGlynn**
> **STEPHEN P. McGLYNN**
> **U.S. District Judge**